UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                 CASE NO. 8:24-cr-164-JLB-AAS

SHEM WAYNE ALEXANDER

**THE UNITED STATES'S SENTENCING MEMORANDUM**

Defendant Shem Wayne Alexander conspired to smuggle firearms from the United States into Trinidad and Tobago. Based on the hundreds of firearms that the defendant's ring smuggled to Trinidad and Tobago (a country struggling to combat gun violence and armed gangs), the defendant's supervisory role in the conspiracy, and the sentences that the defendant's coconspirators received, the United States respectfully requests that the Court sentence the defendant to a 60-month term of imprisonment. 60 months is both the Sentencing Guidelines range and the maximum allowed under the statute of conviction. *See* 18 U.S.C. § 371.

## I.   BACKGROUND

### a.  Facts

The defendant is a citizen of Trinidad and Tobago ("Trinidad"). PSR ¶ 14. Between April 12, 2019 and June 9, 2022, the defendant visited the United States six times, each time using a nonimmigrant visa. Ex. 1 (Certified Travel Records); Ex. 2 (Certified Visa Records). Federal law generally prohibits individuals who enter the United States on nonimmigrant visas from possessing firearms. 18 U.S.C. § 922(g)(5)(B).

During this time, the defendant directed his coconspirators, including Jameal Kaia Phillip; Tevin Obrian Oliver; Edward Soloman King, III; and Shannon Samlalsingh to buy firearms and ammunition for the purpose of smuggling them from the United States to Trinidad. *Id.* ¶¶ 13, 41-43. Specifically, the defendant arranged for U.S. citizens, such as King and Samlalsingh to purchase firearms and ammunition. *Id.* ¶¶ 15-16. The defendant then requested other coconspirators such as Oliver and Phillip to conceal those firearms (sometimes broken down into parts) and ammunition into punching bags, speakers, and other household items. *Id.* ¶¶ 39-40. Phillip and Oliver then shipped the concealed firearms and ammunition to the defendant in Trinidad, where the defendant distributed them. *Id.* ¶¶ 25-28, 33-36, 39-40. The defendant and his coconspirators did not notify the carriers, which threatened the safety of the carriers' staff and infrastructure. *See, e.g.*, HAZMAT-Hazardous Materials, USPIS (Jan. 26, 2026), https://www.uspis.gov/news/scam-article/prohibited-restricted-and-non-mailable-items; How to Ship Firearms (U.S. only), FedEx, https://www.fedex.com/en-us/shipping/how-to-ship-firearms.html (last accessed Feb. 13, 2026). In total, the defendant's smuggling ring exported more than 200 firearms. Ex. 3, at 5-6 (Phillip Second Proffer).

The defendant timely objected to Paragraph 43 of the Report, but the evidence in this case (including the defendant's own words) supports the findings in that paragraph.  Specifically, the defendant objected to the factual findings that he (1) recruited coconspirators; (2) directed coconspirators to purchase specific firearms and

conceal them; and (3) distributed firearms. *Cf.* Report ¶ 43. As shown below, the defendant did in fact do all those things.

### 1.    The defendant recruited coconspirators.

The defendant recruited coconspirators to assist in the conspiracy, most significantly King. *Id.* ¶ 42. King told investigators that a friend introduced him to the defendant in or around 2018, when King visited Trinidad. Ex. 4, at 2 (King Proffer).[1] King and the defendant stayed in contact and met in person when the defendant visited the United States several months later. *Id.* In or around early 2019, King flew to Trinidad again. *Id.* During that trip, King visited with the defendant, who introduced him to Phillip. *Id.* The defendant, Phillip, and King went to a nightclub where the defendant asked King if he had a firearms permit. *Id.* King replied that he did, and the defendant offered to pay him in exchange for King's help in buying firearms in Florida to send to Trinidad. *Id.* Some time after that, the defendant and Phillip visited King in Florida, where the defendant again asked King for help buying firearms.  *Id.* The defendant told King that he would not get in trouble because the Trinidad police would not be able to trace the firearms back to him, and King agreed. *Id.* at 2-3. Phillip also spoke to investigators and corroborated that the defendant recruited King because King had a firearms license. Ex. 5, at 3 (Phillip First Proffer).

---

[1] If the defendant maintains this objection, the United States will call King as a witness at sentencing.

Evidence from two of Phillip's phones, which the Department of Homeland Security downloaded under its border-search authority,[2] indicated that the defendant not only recruited King, but also others. Both of Phillip's phones contained a WhatsApp messenger contact labeled "Shem":



» Contact

| | |
|---|---|
| Name: | Shem |
| Device description: | |
| Source: | WhatsApp |
| Account: | |
| Group: | |
| Created: | |
| Modified: | 6/13/2020 8:13:25 PM(UTC+0) |
| Last time contacted: | |
| Times contacted: | |
| Extraction: | Legacy |
| Source file: | 00008030-0011119E26E9802E_files |

"Shem" and Phillip exchanged numerous WhatsApp messages. The extraction report indicated that the "Shem" contact related to the same phone

---

[2] A Customs and Border Protection Officer detained and extracted the phones after Phillip arrived at Miami International Airport from London Heathrow Airport. Ex. 6, at 2-3 (Certified Electronic Media Report).

number that the defendant used on his application for a United States visa (Ex. 2, at 3):

On July 17, 2020, at 9:46 a.m. (Eastern Time), Phillip sent the defendant a voice message, asking "Who else you have in Tampa other than Ed? Who else?" The defendant replied:



The defendant sent Phillip a follow-up voice message, stating "What happened to you? You don't know my name is Mr. Make It Happen?" The documentary evidence compiled in this case thus shows that the defendant recruited others to the conspiracy.

### 2.    The defendant directed others to carry out the scheme

Not only did the defendant recruit coconspirators, but he also had ultimate authority over the conspiracy. Phillip told law enforcement that, although he considered the defendant a partner, the defendant had final say over which firearms they would purchase for smuggling.  Ex. 3, at 3. WhatsApp messages corroborate Phillip's account. On August 14, 2020, in response to a question from Phillip about what to buy, the defendant wrote:





Similarly, King informed investigators that the defendant was in charge and told Phillip what to do, which Phillip complained about to King because Phillip said that the defendant had less experience in firearms smuggling than Phillip. Ex. 4, at 3. King provided specific examples of the defendant's oversight responsibilities. On April 13 and 14, 2019, King went to a gun show at the Florida State Fairgrounds with the defendant and Phillip, during which King purchased 13 guns that the defendant selected.  Ex. 4, at 3; Report ¶ 16. And, on June 20, 2019, King and Phillip went to a pawn shop in Tampa to attempt to purchase firearms. Ex. 8, at 1-2; Ex. 4, at 3. Phillip called the defendant to discuss which firearms to purchase; the shop

6

clerk noticed Phillip on the phone and suspected a straw purchase, so he kicked

Phillip and King out before they could buy the firearms that the defendant had

chosen. Ex. 8, at 1-2; Ex. 4, at 3.

The defendant also requested that King book hotels or Airbnb rentals for the

purpose of packing firearms.  Ex. 4, at 4. For example, on July 20, 2020, the

defendant forwarded the below screenshot to Phillip:



On July 23, 2020, Phillip also forwarded a request from the defendant that King

book an Airbnb:



. . .









The defendant's objection to the Report's finding that he directed his coconspirators thus lacks merit.

### 3.     The defendant handled distributing the smuggled firearms.

According to Phillip, the defendant received the smuggled firearms in Trinidad. Ex. 7, at 3. On receipt, the defendant would resell them to another individual in Trinidad, who sell some of the firearms within the country and reexport others to Venezuela. *Id.* An April 21, 2022 seizure of firearms at the Piarco International Airport in Trinidad corroborates Phillip's statements. *See* Report ¶¶ 35-36. That seizure followed Oliver sending a package holding firearms hidden in punching bags and other household goods from Miami to Trinidad. *Id.* at ¶¶ 33-34. The shipping bills for that package gave a fictitious name, but the defendant's actual phone number that he used on his United States visa application, for the recipient. Ex. 9, at 5 (Shipping Bill).

### b. Procedural History

In October 2022, a grand jury charged Oliver, Phillip, and King with one count of conspiracy to smuggle firearms from the United States, in violation of 18 U.S.C. §§ 371 and 554. Case No. 8:22-cr-343-SDM-AEP, Doc. 1. Oliver and Phillip both pleaded guilty to that count and, in July 2023, received 57 months of imprisonment. *Id.*, Docs. 111, 120.

In April 2023, King pleaded guilty to a superseding information that charged him with knowingly selling a firearm to an alien admitted to the United States under a nonimmigrant visa, in violation of 18 U.S.C. § 922(d)(5)(B). *Id.*, Docs. 71, 72, 80 In July 2024, King also received a 57-month prison sentence. *Id.*, Doc. 145, at 2.

On April 11, 2024, the grand jury charged the defendant with one count of conspiracy to smuggle firearms from the United States, in violation of 18 U.S.C. §§ 371 and 554.  Doc. 1. The grand jury returned a superseding indictment, which added a count of firearms trafficking conspiracy, in violation of 18 U.S.C. § 933 on October 31, 2024.  Doc. 6.  On August 26, 2025, the defendant entered a guilty plea to Count One per a plea agreement.  Docs. 63, 65.

### c. Gun Trafficking in Trinidad

Gun violence is rife in Trinidad, and the defendant surely was aware of that problem. According to an April 2023 report published by the Small Arms Survey, in 2020, Trinidad experienced one of the highest homicide rates of the Caribbean Community ("CARICOM") member states (28.5 per 100,000 population). *See* Exhibit 10, at 37 (Anne-Séverine Fabre, Nicolas Florquin, Aaron Karp, & Matt

10

Schroeder, *Weapons Compass: The Caribbean Firearms Study* (April 2023). Seventy-five percent of total homicides in Trinidad that year involved the use of a firearm. *Id.* at 38. Gang violence, drug trafficking, and access to illicit firearms have contributed to the rise of gun violence. *Id.* Trinidad reportedly has more than 100 gangs, many of which are involved in trafficking and misuse of firearms. *Id.* at 41. Between 2017 and 2021, police in Trinidad seized approximately 4,087 illicit firearms, the majority of which were handguns. *Id.* at 71. The Trinidad Commissioner of Police filed a statement in connection with the coconspirator's sentencings, which noted that gun violence "has become progressively worse with the illegal importation of firearms from the United States." Ex. 11, at 1 (Police Commissioner Letter). Trinidad does not manufacture firearms, but 84% of the murders in the five years prior to 2023 involved one. *Id.*

The United States is one of the largest sources of arms trafficking in the Caribbean. Ex. 10, at 75. Most of these firearms and ammunition are traced to states with seaports—Florida is high on the list—and are transported via shipping companies, postal and fast parcel services, and commercial airliners. *Id.* at 76, 80. The Commissioner of Police noted that gun trafficking in Trinidad also harms the reputation of the United States in the Caribbean region. Ex. 11, at 2. Moreover, like in this case, concealing these firearms to evade detection is simple: "[t]he trafficker simply needs to camouflage the items well enough to blend in with the thousands of shipments of other goods departing and arriving from international ports every day." Ex. 10, at 79.

The situation was grave during the time of the defendant's conduct and remains so. As a result on April 18, 2023, the Heads of Government of the Caribbean Community agreed to adopt legislation and licensing regulations that would ban assault-style weapons manufactured in the United States. *See* Associated Press, *Caribbean Leaders Agree on Plan to Ban Assault-style Weapons*, (Apr. 19, 2023, 2:56 PM), https://apnews.com/article/caribbean-assault-weapon-ban-caricom-rowley-4fd922b08f52031161a0de395613fe2f. The same day, the Heads of Government jointly declared a "War on Guns," to combat arms trafficking from the United States. *See Declaration by CARICOM Heads of Government – War on Guns*, (Apr. 18, 2023), https://caricom.org/declaration-by-caricom-heads-of-government-war-on-guns/. As part of that declaration, the CARICOM leaders called on the United States to "take action to stop the illegal exportation of firearms and ammunition into the Caribbean." *Id.*[3]

## II.    THE SENTENCING GUIDELINE RANGE IS 60 MONTHS

Although the defendant timely objected to the Report's calculation of his Sentencing Guidelines range, the parties have resolved the objections. USSG §2M5.2 applies, and the base offense level is 26. The USSG §3B1.1(c) aggravating role adjustment applies and provides for a 2-level increase for the defendant's leadership role in offense. The United States will move for the 2-level acceptance of

---

[3] Bureau of Alcohol, Tobacco, Firearms, and Explosives Assistant Regional Attache, Trinidad and Tobago/Southern Caribbean, Michael P. Graham will attend the sentencing hearing. If the sentencing is contested, the United States will call him to testify about the ongoing gun violence crisis in Trinidad.

12

responsibility adjustment down, but not the additional one point because the defendant has not complied with the cooperation provision of his plea agreement. *See* Ex. 11(Jail Message).  Therefore, the total offense level is 26.  Based upon a total offense level of 26 and a criminal history category of I, the guideline imprisonment range is 63 months to 78 months

The Sentencing Guidelines range of imprisonment is thus 63 months to 78 months of imprisonment.  But because the statutory maximum is 60 months, the statutory maximum is the appropriate range.  *See* 18 U.S.C. § 371; *see also* USSG § 5G1.1(a)

## III.    APPLICATION OF 3553(a) FACTORS

The United States respectfully submits that a sentence of 60 months in prison, to be followed by three years of supervised release, is "sufficient, but not greater than necessary," to serve the purposes set forth in 18 U.S.C § 3553(a).

First, the nature and circumstances of the offense favor the guidelines, statutory maximum sentence, especially when viewed in the context of the arms trafficking scourge affecting Trinidad. Here, the defendant conspired to conceal and send more than 200 firearms from the United States to Trinidad. This defendant recruited others to do what he could not—legally buy firearms in the United States, then stay within the country to hide them in punching bags and speakers for illicit re-export. Although Trinidadian authorities intercepted some of them before they entered Trinidad's criminal underworld, many of those firearms made it to Trinidad

13

and the wider Caribbean region. The defendant's conduct fueled the ongoing gun and gang violence in Trinidad and the wider Caribbean region.

The history and characteristics of the defendant similarly warrant a guidelines, statutory maximum sentence. The United States acknowledges that the defendant has no criminal history and timely accepted a plea agreement. But the defendant has rebuffed the United States's outreach for the debrief required by his plea agreement in terms that indicates that he does not accept responsibility for his conduct. *See* Ex. 12. And, this defendant is a college graduate who appears to have had legitimate business activities and family support in his home country.  Instead of using his education productively and focusing on the abundant lawful opportunities and taking advantage of his resources, the defendant instead chose to enrich himself by firearms trafficking and profiting from one of the most dangerous criminal activities plaguing his home country. What's more, the defendant enlisted the support and assistance of co-conspirators to further this criminal end.

Relatedly, a term of imprisonment of 60 months will "reflect the seriousness of the offense. . . promote respect for the law, and . . . provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The defendant's disregard for the laws of the United States and his home country is troubling. His disregard for the safety of others is worse. This defendant smuggled into Trinidad more than 200 firearms for sale on the illicit market and through the skies unbeknownst to those common carriers and shipping companies handling the firearm-laden shipments. His agreement to purposefully evade the disclosure requirements to the carriers is not a

mere technical violation: the defendant and his coconspirators risked the safety of the people handling their shipments, both on the ground and in the air, in their pursuit of money. He should be punished accordingly.

In addition, the requested sentence will deter the defendant (and other gun traffickers) and protect the public from this defendant's future crimes. *Id.* § 3553(a)(2)(B), (C). A significant prison sentence will incapacitate this defendant for a lengthy period of time. And because of the apparent ease of concealing firearms from common carriers, a significant punishment for those who are caught will cause potential smugglers to think twice.  A statutory maximum sentence will send a message to both this defendant and aspiring gun smugglers, as well as to the public, that these dangerous crimes will result in significant prison time. *See United States v. Howard*, 28 F.4th 180, 208 (11th Cir. 2022) ("[G]eneral deterrence is a critical factor that must be considered and should play a role in sentencing defendant.").

Finally, a 60-month sentence avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See id.* § 3553(a)(6). Oliver, Phillip, and King received 57-month sentences each. But this defendant was, at the very least, the lead partner in this scheme, if not their manager. This defendant ordered those three coconspirators to buy and ship firearms for distribution in Trinidad. Anything less than 57 months would create a significant and unjustified sentencing disparity.

## IV.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant to a term of imprisonment of 60 months and three years of supervised release.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By:    /s/ Adam W. McCall
Adam W. McCall
Assistant United States Attorney
United States Attorney No. 226
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Adam.McCall@usdoj.gov

16

**U.S. v. Alexander**                              **Case No. 8:24-cr-164-JLB-AAS**

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2026, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Ana M. Davide, Esq.

*/s/ Adam W. McCall*
Adam W. McCall
Assistant United States Attorney
United States Attorney No. 226
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Adam.McCall@usdoj.gov